**Dallas BIECHELE et al., Plaintiffs,**

**v.**

**NORFOLK & WESTERN RAILWAY CO., Defendant.**

**No. C68–139.**

United States District Court
N. D. Ohio,, W. D.
June 19, 1969.

Thomas Murray Jr., Murray & Murray, Sandusky, Ohio, for plaintiffs.

Raymond N. Watts, Flynn, Py & Kruse, Sandusky, Ohio, Charles W. Peckinpaugh, Jr., Shumaker, Loop & Kendrick, Toledo, Ohio, for defendant.

## OPINION

DON J. YOUNG, District Judge.

This action was originally commenced in the Court of Common Pleas of Erie County, Ohio, and was removed to this Court by defendant on the ground of diversity of citizenship. The action was intended as a class action, and seeks damages and an injunction because of an alleged nuisance created by defendant in the operation of its coal storage and shipping facilities in Sandusky.

After some preliminary skirmishing the Court concluded that this was properly maintainable as a class action and that a representative class was present. Federal Rules of Civil Procedure 23(a). Actually, there are two separate and distinct class actions involved. The first and principal action is that for injunctive relief. The action is founded upon Rule 23(b) (1) and (2) of the Federal Rules of Civil Procedure. Jurisdiction for this action is based upon diversity, 28 U.S.C. § 1332, the amount in controversy being the value of the right involved. Hulsenbusch v. Davidson Rubber Co., 344 F.2d 730 (8th Cir. 1965); Pennsylvania R. R. Co. v. City of Girard, 210 F.2d 437 (6th Cir. 1954); John B. Kelly, Inc. v. Lehigh Nav. Coal Co., 151 F.2d 743 (3rd Cir. 1945); Wisconsin Electric Co. v. Dumore Co., 35 F.

2d 555 (6th Cir. 1929). It appears to the Court that the right of each member of the class to live in an environment free from excessive coal dust and conversely, the right of defendant to operate its coal loading facility are both in excess of $10,000.00.

The second action is one for damages resulting from the action of defendant. This action has predominating factual questions in common with the injunctive action and requiring the same evidence as presented in that action. The damage action is properly maintainable as a class action under Rule 23(b) (3) of the Federal Rules of Civil Procedure, common questions of fact predominating. Although diversity of citizenship exists between the parties, the Court does not believe that any of the claims exceed $10,000.00. These claims cannot be aggregated to achieve the jurisdictional amount. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (March 25, 1969).

Jurisdiction properly lies in this Court under 28 U.S.C. § 1441(c). The claims are sufficiently separate to allow removal of the injunctive action alone. Therefore this Court, in the interest of judicial efficiency, will assume jurisdiction over the entire controversy. Climax Chemical Co. v. C. F. Braun & Co., 370 F.2d 616 (10th Cir. 1966); Moosbrugger v. McGraw-Edison Co., 215 F. Supp. 486 (D.Minn.1963).

Delineation of the class in the damage action through the establishment of geographical boundries was undertaken. Evidence taken at a hearing for a temporary restraining order before Senior District Judge Kloeb as to the extent and locations of the complaints together with a knowledge of the prevailing winds was employed in ascertaining the geographical boundries to be employed. Without such geographical delineation any person who felt that he had been aggrieved by defendant's operation of its coal dock, regardless of the geographical remoteness of his claim, would have had the right to gain redress in this Court. Through this limitation the

Court is able to give attention to the vast body of claims for which a reasonably plausible geographical basis can be determined, avoid placing great strain on its docket with numerous actions with only nuisance value, and preserve to the truly aggrieved individual whose claim is geographically remote his right of action (since he, not being a member of the class, is not bound by the judgment).

In furtherance of the policy of the 1966 amendment to Rule 23 to prevent one way intervention and to prevent as much as possible the solicitation of claims as well as to provide the court and the parties with some idea of the real magnitude of the controversy, the Court entered an order requiring all those desiring to present damage claims to enter an appearance in the case on or before November 8, 1968. Such orders are not unknown. Iowa v. Union Asphalt & Roadoils, Inc., 281 F.Supp. 391 (S.D.Iowa 1968); Philadelphia Electric Co. v. Anaconda American Brass, 43 F. R.D. 452 (E.D.Pa.1968); Harris v. Jones, 41 F.R.D. 70 (D.Utah 1966).

No list of the potential members of the class in the damage suit was available nor could one have been compiled. Therefore the Court determined that the best possible service would be by publication of its orders delineating the class and requiring the presentation of claims together with the notice required by Rule 23(c) (2) of the Federal Rules of Civil Procedure. It was, however, determined that the publication in the Sandusky Register would not be a standard legal notice, but would be prominently placed so that the class members would better have the attention drawn to it. See, Booth v. General Dynamics Corp., 264 F.Supp. 465 (N.D.Ill.1965). As a result of this notice, seven hundred thirty-one (731) persons joined the damage action as plaintiffs, five hundred thirty-two (532) filed declinations to participate and several thousand others took no action.

Promptly thereafter, by agreement of the parties, the case was submitted to the Court upon evidence and written argument for a determination of the question of whether or not there was an actionable nuisance, and, if there was, whether plaintiffs were entitled to an injunction, to damages, or to both. The agreement provides that if the Court finds there is an actionable nuisance entitling plaintiffs to damages, a special master will be appointed to hear the evidence as to the amount of damages suffered by each of the seven hundred thirty-one individual parties plaintiff.

Several days were required to present the evidence, and very extensive briefs were filed by the parties, as a result of which the Court has come to the findings of fact and conclusions of law that are expressed in this opinion.

The evidence shows that about 1939 the Pennsylvania Railroad Company constructed a large coal loading facility extending out into Sandusky Bay in the northwesterly portion of the City of Sandusky, Ohio. As much as fourteen million tons of coal a year were loaded through these facilities when they were first constructed, but because of the changing uses of fuels, the amount of coal handled declined to about three million tons in the last year of the Pennsylvania Company's operations, and somewhere around two million tons in the first year of the defendant's operations. Defendant acquired the facilities in 1964.

The Pennsylvania Company had handled coal in comparatively large and coarse sizes, the demand for which has fallen off greatly from the early years of its operations of the facilities, as most of this coal was used for heating. Its operations had been seasonal, since the bay and the great lakes freeze in the winter.

Defendant determined to modernize the facilities to use them for the loading and storage of industrial coals, which are much smaller in size than heating coals, and include large quantities of "fines", which are actually coal dust. Its operations and equipment were designed to receive coal from the mines

twelve months of the year, storing it on the ground when the lake and bay were frozen, and picking it up and loading it into ships at much faster rates than formerly possible when the shipping was open.

These operations commenced in earnest about in September of 1967. As the time passed, and the amount of coal in storage on the defendant's pier increased, the citizens of Sandusky, particularly those near the pier, began to be troubled by black dust accumulating on their houses and furniture. By March of 1968, the situation was causing a great deal of difficulty, which continued through the summer into the early fall. It was obvious to the casual observer that coal dust was blowing off defendant's storage piles, and the black dust observed by the irate citizenry was assumed to be coal dust. The evidence in the case leaves no doubt whatever of the correctness of this assumption.

In response to protests, defendant had engineering studies made and attempted by various means to reduce the amounts of coal dust blowing about. It also hired an expert, C. F. Broeman & Co., to conduct air pollution sampling and studies with reference to the problem.

At the trial of the case, the overwhelming weight of the evidence showed that persons who lived in various parts of Sandusky, and had had no more problem with dust and dirt than is common in cities, started to have serious problems when the defendant began to stockpile coal. Black, greasy, dirt, which was difficult to wash or clean off, accumulated on their sidewalks, porches, outdoor furniture, and automobiles. It ruined the paint on their homes, drifted inside and damaged rugs, draperies, and other furnishings. It could not be kept cleaned up, in spite of extra housework and efforts. There was some evidence as to corrosion on aluminum decorative grills and rails, and even destruction of tarpaulins used to cover boats. All of this was demonstrated by photographs and samples. There was also testimony and photographs of coal dust blowing from coal piles on defendant's pier in large clouds.

There were some disputes in the testimony of such experts as chemists and allergists as to the properties and effects of airborne coal dust, but the greater weight of this evidence clearly and convincingly established that the dust samples collected by plaintiffs were mostly coal dust, and that such coal dust could and would do the various damages attributed to it.

The testimony further established that in the fall of 1968, as the amount of coal in storage on the pier diminished, the problem began to abate, until in November and perhaps early December, when there was little or no coal in storage on defendant's pier, things were almost back to what they had been before the latter part of 1967. However, by the time of the hearing, about the middle of January, 1969, the dust problems were again arising, as the amount of coal in storage increased.

The Court observed with interest at the trial that the reports of defendant's air pollution expert of his samplings bore out the testimony of the plaintiff householders and witnesses as to the cycle of dust difficulties. The technique used by this expert, which is the conventional technique for determining pollution by particulate matter small enough to be suspended by Brownian movement, was not calculated to give a very accurate picture of the extent of the problem caused by blowing dust particles as large as those involved here, but it nevertheless clearly supported the plaintiffs' testimony.

■ The factual conclusion is inescapable that the plaintiffs were injured in various respects, and to various extents, in their real estate, their personal property and effects, and in their persons by large quantities of coal dust blown from the shipping and storage facilities of the defendant.

As is frequently the case when the factual situation is clear and simple, the

legal issues are of some complexity, and the defendant has used great technical skill in taking advantage of the tendency of the courts to use loose, ambiguous, and confusing language in discussing legal problems in this area. The problems arise because there is no sharp line of demarcation between the fields of negligence and nuisance, and in cases in the borderline area, the courts will use expressions relating to both fields interchangeably and imprecisely.

It is not this Court's intention to write a learned treatise on the law of nuisance. The facts of the present case bring it squarely within the following statement of the law of nuisance:

"Strict or absolute liability is always applied where one does anything, or permits anything under his control or direction, to be done, without just cause or excuse, the necessary consequence of which interferes with or annoys another in the enjoyment of his legal rights. In such case the actor commits an intentional act involving a culpable wrong. Where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, the law of negligence has no application and the rule of absolute liability applies." Taylor v. Cincinnati, 143 Ohio St. 426, 432, 433, 55 N.E. 2d 724, 727, 155 A.L.R. 44 (1944).

The *Taylor* case, of course, bears not the remotest resemblance to the present case upon its facts, but it contains an elaborate treatise upon the law of nuisance generally which, while it might arguably be dictum, is generally followed as summarizing and expressing the law of Ohio upon the subject, and hence is binding upon this Court in this case.

The defendant makes much point in argument that it is and has been doing everything possible to prevent the difficulty, and was not negligent in its operation of coal storage and loading, and hence is not liable to the plaintiffs. Assuming this to be true, which plaintiffs strenuously deny, this argument may be answered by reference to an old case, citation unknown, dealing with the action of a man whose house was being shaken to pieces by blasting in a neighbor's quarry. The court held that it was no comfort to the plaintiff to know that his house was being demolished by the defendant in the most careful manner possible.

We are, happily, departing from the era in which it was considered proper for any commercial enterprise, in the name of those profits which are not a dirty word in Ohio, to pollute the atmosphere, earth, and water beyond the endurance of the general public. The defendant may or may not have succeeded to some of Commodore Vanderbilt's enterprises, but his attitude is an impermissible anachronism, and ill becomes defendant.

It is possible that this Court has the burden of deciding whether the plaintiffs must continue to suffer in defendant's filth, or become citizens of a ghost town on an abandoned railway line and a silted-up harbor. If so, the latter seems the lesser of two evils, especially in view of the maxim "Sufficient unto the day is the evil thereof." The present difficulty is certain, but the future disasters are uncertain. It may well be that the citizens of Sandusky can jump out of the frying pan and still avoid falling into the fire.

■ Plaintiffs are entitled to judgment in this case, but the form that the judgment should take presents serious questions. Certainly each of the individual plaintiffs is entitled to a judgment for the damages that he can show he has suffered as a result of defendant's activities. Necessarily, this means that if the amounts of damages to each of the seven hundred thirty-one plaintiffs cannot be stipulated, the evidence will have to be heard in order to establish them.

The only practical means of working out the damage matters appears to be to refer the matter to a special master, who should be a resident of the Sandusky area. The special master should fix a deadline to file a written statement of claim, either personally or by counsel, before the deadline. All counsel should consult with the special master to work out the forms and procedures for filing and processing the damage claims, with the objective of reducing to a minimum the number of claims which will have to be heard upon the evidence. With respect to claims which cannot be stipulated as to amount, those claimants whose recovery does not exceed the sum of one hundred dollars shall have to pay the fees of the special master for conducting the hearing upon their claims, together with the other costs of the hearing.

The matter of injunctive relief is not so simple, either from a legal or from a practical standpoint. It is complicated by the fact that the situation developed by the evidence has not continued long enough to make it entirely certain that the defendant has succeeded in overcoming the dust problem by the actions which the evidence established it had taken in an effort to do so. The increase in the dust accumulation at the time of trial weighs against this contention, but is not completely dispositive of it. From the oral arguments which were heard on June 17, 1969, it was clear that the nature and extent of the difficulties between January and June was in very considerable dispute.

The question of whether the award of damages up to the time of commencement of the action, with the right to bring successive actions if the nuisance continues, affords an adequate remedy at law, is not a simple one. The weight of authority appears to be that since the nuisance is a continuing one, actions at law for damages are not an adequate remedy since a multiplicity of damage suits for each individual plaintiff would result. Hence equitable relief by way of injunction is permissible. However, just as the defendant has no right to destroy the property of the plaintiffs by its operations, it is questionable whether plaintiffs have a right to relief which would destroy the legitimate activities of defendant.

■ Under the principles of equity, the Court has broad powers to fashion effective relief, even though it may have to retain a continuing jurisdiction to modify or change orders granted.

■ A mandatory order of injunction must issue, requiring defendant to continue the various methods of dust control it has been employing on the coal docks, until further order of the Court. Cf. Deisenroth v. Dodge, 350 Ill.App. 20, 111 N.E.2d 575 (1953); Toledo, A. A. & N. M. R. R. v. Pennsylvania Co., 54 F. 730 (N.D. Ohio), aff'd, sub nom Ex parte Lennon, 150 U.S. 393, 14 S.Ct. 123, 37 L.Ed. 1120 (1893). Not later than January of 1970, or earlier upon application of any of the parties hereto, the Court will set a hearing to determine what the facts are at the time of that hearing as to the blowing of dust from the coal storage piles, and the accumulation of dust upon the properties of the plaintiffs. To the extent that the situation shown in evidence at the January, 1969, hearing is uncorrected, the Court will consider modification of the present order. See, United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932).

From the evidence, it appears to the Court that it should be possible to work out economically feasible methods of controlling the emission of coal dust without inhibiting the operations of defendant's facilities, and even permitting defendant to expand the operations should it desire to do so.

Counsel should, within ten days, endeavor to agree upon an order, or should submit to the Court their separate forms of order, if they cannot agree, which will embody the foregoing conclusions, and vest in this Court a continuing jurisdiction until the coal dust problems are resolved.