**CITY OF CHICAGO, Plaintiff-Appellant,**

v.

**GENERAL MOTORS CORPORATION et al., Defendants-Appellees.**

**No. 71–1645.**

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1972.

Decided Sept. 19, 1972.

Richard L. Curry, Corp. Counsel, William R. Quinlan, Asst. Corp. Counsel, Jerome H. Torshen, Sp. Asst. Corp. Counsel, Chicago, Ill., for plaintiff-appellant.

Hammond E. Chaffetz, Alan I. Becker, Joseph DuCoeur, G. E. Hale, Robert F. Forrer, Erwin C. Heininger, Roger W. Barrett, Robert L. Stern, James B. O'Shaughnessy, William T. Hart, Luther C. McKinney, John J. McHugh, Douglas C. Moir, Edward J. Wendrow, Chicago, Ill., for defendants-appellees.

Before KILEY and SPRECHER, Circuit Judges, and DURFEE, Senior Judge.*

SPRECHER, Circuit Judge.

The city of Chicago brought this diversity class action, based upon the Illinois common law of strict product liability, which seeks to have the federal court create standards requiring automobile manufacturers to equip all new, and to recall and furnish all old, vehicles operating within Chicago with tamper-proof emission control devices, thus solving a substantial portion of the city's air pollution problem in one bold, quick stroke.

On July 31, 1970, the city of Chicago, individually and on behalf of all Illinois citizens who are residents of Chicago, filed a 20-count complaint against the major automobile and truck manufacturers, alleging that the motor vehicles manufactured and sold by the defendants substantially contribute to air pollution in Chicago by their daily emissions of tons of carbon monoxide, hydrocarbons, oxides of nitrogen and particulate matter while being used in the usual and customary manner intended for such vehicles; that contamination of Chicago air by motor vehicles creates an unreasonable danger to public health, causing such vehicles to be unreasonably, inherently and imminently dangerous and defective; and that contamination of the air has injured and continues to injure Chicago in the maintenance of its property and the performance of its corporate functions of protecting the health and welfare of its citizens and has reduced the revenues of the city and endangered the health and welfare of its citizens. The complaint prayed that the court decree that motor vehicles are dangerous to the public health and order the defendants to cease the sale of motor vehicles within the city unless such vehicles are equipped with tamper-proof emission control devices. The complaint further prayed that the court order the defendants to furnish without charge to each plaintiff purchaser of any vehicle manufactured by the defendants in model years 1960 through 1970 a control device similar to that installed in new vehicles

---

* Senior Judge James R. Durfee of the Court of Claims is sitting by designation.

and meeting the court-created standards.

Defendants moved to dismiss the complaint for the reasons that Chicago was not a member of the class which it purported to represent; that the amount in controversy did not exceed $10,000 in respect to each alleged member of the plaintiff class; that plaintiff failed to state a claim for which relief could be granted under products liability law or improper design; that relief would conflict with federal regulation of motor vehicle emissions and would infringe upon an area of regulation specifically preempted by Congress and would constitute an undue burden on interstate commerce; that there was no basis for equitable relief; that the determination and enforcement of relief are matters best handled by an expert administrative agency; that the requested relief involving retroactive application of new standards would constitute a violation of due process; and that plaintiffs' claims were barred by the statute of limitations or by laches.

The city acknowledged in its brief in this court that "Chicago has filed this action as the first of its type in the country using the theory employed in the Complaint." The district court, in dismissing the complaint, agreed, saying:

"Plaintiff's claim is not grounded in a statute, but in the common law, the judicially manufactured law of products liability. Yet, it is clear that this is not an ordinary products liability case, that plaintiff's theory is by no means common and not yet law. In fact, plaintiff's cause, in theory and scope is unique." 332 F.Supp. 285, 289 (N.D.Ill.1971).

Before considering this theory, it will be helpful to summarize the legislative developments regarding air pollution.

As early as 1955, Congress enacted the Air Pollution Control Act,[1] which recognized the primary responsibilities and rights of the states, local governments, and other public agencies in controlling air pollution. The 1955 Act was replaced in 1963 by the Clean Air Act.[2] Under this Act, the Secretary of Health, Education and Welfare was directed to appoint a technical advisory committee to evaluate progress and recommend research on devices and fuels for the control of automotive vehicle emissions, which work was to be reported semi-annually to Congress by the Secretary. In 1965, Congress amended the Clean Air Act to include a section known as the Motor Vehicle Air Pollution Control Act,[3] which directed the Secretary to prescribe standards applicable to exhaust emissions from new motor vehicles.

The Air Quality Act of 1967[4] further amended the Clean Air Act and provided the basis for systematic control activities on a regional basis. The Act explicitly provided for preemption by the federal government of the entire field of standards for emissions from new motor vehicles.[5]

After the complaint was filed in this case, Congress passed the Clean Air Amendments of 1970,[6] which included a substantial rewriting of the National

1. Pub.L. 159, 84th Cong., 1st Sess. (July 14, 1955), 69 Stat. 322.

2. Pub.L. 88–206, 88th Cong., 1st Sess. (Dec. 17, 1963), 77 Stat. 392.

3. Pub.L. 89–272, 89th Cong., 1st Sess. (Oct. 20, 1965), 79 Stat. 992.

4. Pub.L. 90–148, 90th Cong., 1st Sess. (Nov. 21, 1967), 81 Stat. 485.

5. 42 U.S.C. § 1857f–6a(a): "No state or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this subchapter. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment."

6. Pub.L. 91–604, 91st Cong., 2d Sess. (Dec. 21, 1970), 84 Stat. 1690.

Emissions Standards Act.[7] Prior to the 1970 legislation the National Emissions Standards Act provided that "actions to restrain such violations shall be brought . . . in the name of the United States." 42 U.S.C. § 1857f–3. The 1970 legislation amended this provision to provide that "any person may commence a civil action on his own behalf" against any person including the United States and any other governmental instrumentality who is alleged to be in violation of an emission standard of limitation under the Act. 42 U.S.C. § 1857h–2(a). The 1970 amendments also provided (42 U.S.C. § 1857h–2(e)):

> "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief. . . ."

■ Since the city explicitly abandoned its claim to new vehicles covered by the 1970 amendments and since citizen suits were first permitted by the 1970 amendments, the district court held that "we will not entertain any action by this plaintiff with respect to motor vehicles covered by the 1967 federal legislation"—that is, new motor vehicles commencing with the 1968 model year. 332 F.Supp. at 291. We agree with the district court that federal preemption extends that far. The city of Chicago has not sought here to enforce the federal legislative and administrative standards, but instead seeks to have the federal court create a competing set of standards based on Illinois common law. If Illinois is barred and Chicago is barred from enforcing "any standard relating to the control of emissions from new motor vehicles . . . subject to this subchapter [1967 National Emissions Standard Act]," 42 U.S.C. § 1857f–6a(a), Chicago cannot seek to enforce through the federal courts different standards purportedly based on Illinois common law.

Preemption does not apply to used motor vehicles in the model years 1960–1967.[8]

■ In Illinois v. City of Milwaukee, 406 U.S. 91, at 103, 92 S.Ct. 1385, at 1392, 31 L.Ed.2d 712 (1972), the Court stated: "When we deal with air or water in their ambient or interstate aspects, there is a federal common law. . . ."[9]

---

7. 42 U.S.C. § 1857f–1 et seq. Subchapter II, formerly known as the Motor Vehicle Air Pollution Control Act, was renamed the National Emissions Standards Act by the 1967 Act. Pub.L. 90–148.

8. *See* Washington v. General Motors Corp., 406 U.S. 109, 115, 92 S.Ct 1396, 1399, 31 L.Ed.2d 727, n. # 4 (1972):
   "Because federal motor vehicle emission control standards apply only to new motor vehicles, States also retain broad residual power over used motor vehicles. Moreover, citizens, States and local governments may initiate actions to enforce compliance with federal standards and to enforce other statutory and common law rights. 42 U.S.C. § 1857h–2."
   Common law citizens' suits to protect the environment have been advocated by commentators before and since their encouragement by Congress in 42 U.S.C. § 1857h–2(a). *See, e. g.,* Sax, Defending the Environment—A Handbook for Citizen Action (Vintage Books 1972); Hanks & Hanks, "An Environmental Bill of Rights: The Citizen Suit and the

National Environmental Policy Act of 1969," 24 Rutgers L.Rev. 230 (1970); Maloney, "Judicial Protection of the Environment: A New Role for Common-Law Remedies," 25 Vand.L.Rev. 145 (1972); Comment, "Environmental Law: New Legal Concepts in the Anti-pollution Fight," 36 Mo.L.Rev. 78 (1971). Particularly regarding air pollution, see Jurgensmeyer, "Control of Air Pollution Through the Assertion of Private Rights," 1967 Duke L.J. 1126; Rheingold, "Civil Cause of Action for Lung Damage Due to Pollution of Urban Atmosphere," 33 Brooklyn L.Rev. 17 (1966). Regarding water pollution, see Note, "Water Quality Standards in Private Nuisance Actions," 79 Yale L.J. 102 (1969); Note, "Private Remedies for Water Pollution," 70 Colum.L.Rev. 734 (1970); Davis, "Theories of Water Pollution Litigation," 1971 Wis.L.Rev. 738; Note, "Environmental Law—Private Remedies for Pollution of Navigable Waters," 50 N.C.L.Rev. 153 (1971).

9. The Court added at 103, 92 S.Ct. at 1392 n. 5: "While the various federal en-

However, the complaint of the city of Chicago in this case was framed in the strict liability idiom of Illinois common law ("unreasonably dangerous").[10] And in this diversity case we are bound to follow Illinois common law.

The district court abstained from proceeding in regard to the city of Chicago's individual claim regarding used motor vehicles for the model years 1960–1967 because that claim extended into three "virgin areas of state law:" (1) "the extent of a motor vehicle manufacturer's duty to produce a reasonably safe product;" (2) "the right of a bystander to recovery;" and (3) application of "newly anticipated guidelines to . . . metropolitan vehicular air pollution." 332 F.Supp. at 290.

In view of the Congressional invitation to citizens generally to make use of com-mon law remedies, we see no reason why a federal court in a diversity case could not anticipate that in due course all common law remedies, including strict liability, will be applied to air pollution and other environmental problems, assuming that the other common law elements of strict liability exist.

Although non-automobile owning bystanders were part of the city's proposed class in that their health was sought to be protected, the district court dismissed the class action aspects of the complaint.[11] Inasmuch as the city's own injury is in the maintenance of its property and the performance of its corporate functions of protecting the health and welfare of its citizens generally, the bystander problem is not directly involved in the absence of a bystander class. We note, however, that subse-

---

vironmental protection statutes will not necessarily mark the outer bounds of the federal common law, they may provide useful guidelines in fashioning such rules of decision. . . ." *See also* Note, "Federal Common Law and Interstate Pollution," 85 Harv.L.Rev. 1439 (1972) ; Texas v. Pankey, 441 F.2d 236 (10th Cir. 1971).

10. In its brief on appeal, the city says (p. 19) that "the rights asserted in the complaint fall within well settled principles of products liability law as enunciated and applied by the courts of Illinois and other jurisdictions."

11. The district court held that Chicago did not adequately represent the class and that "its interests are not co-extensive with nor representative of that gigantic and extraordinarily diverse class." In view of our disposition of this case, we need not decide the correctness of the district court ruling.

Our holding also makes unnecessary a decision as to whether all members of the class could meet the jurisdictional requirement of more than $10,000 in controversy. In City of Inglewood v. City of Los Angeles, 451 F.2d 948 (9th Cir. 1972), the plaintiff city, as here, brought a class action for damages and injunctive relief on behalf of all of its citizens and residents against the city of Los Angeles for causing damage through the operation of its airport. The Court of Appeals found that "to a legal certainty the amount in controversy for some plaintiffs is not more than $10,000" and directed the district court to dismiss the complaint as to all parties who were clearly unable to meet the requirements of jurisdictional amount. *See also* Zahn v. International Paper Co., 53 F.R.D. 430, 431–432 (D. Vt.1971), holding in a class action for damages as a result of the pollution of Lake Champlain, that Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) "precludes our obtaining jurisdiction over those members of the proposed class who do not meet the $10,000 jurisdictional requirement." The question here would be difficult inasmuch as the cost of equipping a used vehicle with an exhaust control system is probably less than $100 per vehicle. National Air Pollution Control Administration Publication No. AP–66, "Control Techniques For Carbon Monoxide, Nitrogen Oxide, and Hydrocarbon Emissions From Mobile Sources" (March, 1970), pp. 4–14, 5–22. However, it can be argued that the "damage" per person is greater than the cost of the emission control device prayed for in the complaint. A study made in 1960 found that air pollution cost the average person about $200 per year. Leinwand, Air and Water Pollution (Washington Square Press 1969), p. 25. *See also* Biechele v. Norfolk & Western Ry. Co., 309 F.Supp. 354, 355 (N.D.Ohio 1969), in which the court held that "the right of each member of the class to live in an environment free from excessive coal dust and conversely, the right of defendant to operate its coal loading facility are both in excess of $10,000."

quent to the decision of the district court, an Illinois appellate court has held that a bystander may seek recovery from the manufacturer of a product. Mieher v. Brown, 3 Ill.App.3d 802, 278 N.E.2d 869 (5th Dist.1972). *See also* White v. Jeffrey Galion, Inc., 326 F.Supp. 751 (E.D.Ill.1971).

The district court was undoubtedly correct in its first assumption, however, that Illinois strict liability law has not been extended to embrace the city's claim in regard to vehicles manufactured from 1960–1967. In fact, we proceed a step further than the district court and conclude that unless the Illinois common law concept of strict liability is materially changed by the Illinois courts, the city's claim does not state a claim for relief under Illinois law. Hence we affirm the district court's dismissal of the claim, not on the district court's theory of abstention (which might as a matter of sound judicial administration require a stay and retention of jurisdiction rather than dismissal, Zwickler v. Koota, 389 U.S. 241, 244 n. 4, 88 S.Ct. 391, 19 L.Ed. 2d 444), but rather on the basis that the complaint fails to state a claim under Illinois products liability law.

Illinois became a strict liability jurisdiction in 1965 when it adopted in effect the Restatement, Second, Torts § 402A, in Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182 (1965). Section 402A provides in part:

> "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if . . . (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

The doctrine has been termed "strict liability" because the manufacturer may be held liable regardless of whether he is negligent and without regard to privity of dealings between the manufacturer and the ultimate injured user.

■ In *Suvada*, the Supreme Court of Illinois pointed out at 210 N.E.2d 188:

> "The plaintiffs must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control."

■ The test of what is "unreasonably dangerous" must be applied to each product (in this case to each automobile) and not to the gross effect of an indefinite conglomerate of products manufactured by several manufacturers. This is made reasonably clear by Comment *i* to § 402A of the Restatement, Second, Torts, which provides in part:

> "Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involve some risk of harm, if only from overconsumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous."

■ The city has not alleged that any particular motor vehicle is unreasonably dangerous because of defective design or manufacture nor that any vehicle has caused any particular injury to any particular person. To allege that an indeterminate number of persons are generally harmed by an atmosphere polluted and contaminated by an indeterminate number of sources [12] does not state a cause of action under Illinois law nor a claim upon which relief can be granted in this court.[13]

This conclusion does not, of course, diminish in any way whatever police powers the city of Chicago or state of Illinois may possess [14] to deal with precisely the same problems involved in these proceedings.[15] In fact since the complaint was filed in this case, both Illinois [16] and Chicago [17] have taken steps

12. The sources of air pollution include, in addition to gasoline-powered motor vehicles which produced in 1968 about 59% of carbon monoxide emissions, 47% of hydrocarbon emissions and 32% of nitrogen oxide emissions: carbon monoxide emissions principally from forest and structural fires, coal refuse and agricultural burning, solid waste disposal, industrial processes, fuel combustion in stationary sources and aircraft; hydrocarbon emissions principally from industrial processes, fire and burning, organic solvent evaporation, solid waste disposal and gasoline marketing; nitrogen oxide emissions principally from fuel combustion in stationary sources, fires and burning and solid waste disposal; sulphur oxide emissions (virtually none from motor vehicles) principally from fuel combustion in stationary sources (mainly power plants) and industrial processes; and particulates (2.8% from gasoline motor vehicles) principally from fuel combustion in stationary sources, industrial processes and forest fires. National Air Pollution Control Administration Publication No. AP–73, "Nationwide Inventory of Air Pollutant Emissions, 1968." Sulphur oxides and particulates appear to the the most dangerous to health. HEW, "Danger in the Air: Sulphur Oxides and Particulates" (May, 1970).

13. Illinois courts have not extended the state's strict liability doctrine to include an aggregation of causes and effects and they have indicated that they would not do so in the future. In a case involving the closely analogous strict liability doctrine of § 402B, Restatement, Second, Torts, the Illinois Supreme Court in Rozny v. Marnul, 43 Ill.2d 54, 250 N.E. 2d 656, 661, 662 (1969) pointed out that the persuasive factor in rejecting liability in Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 174 N.E. 441 (1931) was the existence of potential "liability in an indeterminate amount for an indeterminate time to an indeterminate class" and that " . . . the virtually unlimited and unknown potential responsibility of the defendant weighed heavily in the courts' thinking" in Ultramares. The court concluded that "We agree that the unknown and unlimited liability factor as so ably stated by Mr. Justice Cardozo in the Ultramares case, is not to be lightly discounted."

14. 42 U.S.C. § 1857f–6a(c) provides: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." Many municipalities are considering banning the use of automobiles within the heart of the city under their police powers to make and enforce reasonable traffic regulations. Washington Sunday Star and Daily News, September 3, 1972, p. D–3. Presumably, the police power to protect the public health would also authorize such action.

15. In Diamond v. General Motors Corp., 20 Cal.App.3d 374, 97 Cal.Rptr. 639, 645 (1971), the California Court of Appeals said: "Plaintiff is simply asking the court to do what the elected representatives of the people have not done: adopt stricter standards over the discharge of air contaminants in this country, and enforce them with the contempt power of the court."

16. In 1970, the State of Illinois enacted the Environmental Protection Act, Ill. Rev.Stat. ch. 111½, § 1005(b) (Supp. 1970), which vests statewide authority in a Pollution Control Board to "determine, define and implement the environmental control standards in the State of Illinois." The Board has stated that "we are able to propose effective and reasonable emission control standards for stationary emission sources so that in conjunction with national emission standards for motor vehicles, the ambient air quality standards . . . can be attained by

17. See note 17 on page 1269.

to protect the public against motor vehicle emissions.

The district court's judgment of dismissal is affirmed.

July 1, 1975 throughout the State." Pollution Control Board, Newsletter # 35, November 10, 1971, "General Discussion of Part 2," p. 1.

17. After public hearings, the Chicago City Council on November 29, 1971, adopted exhaust emission standards for hydrocarbons and carbon monoxide which prohibit the operation after June 1, 1973 of vehicles that fail to comply. Chicago Municipal Code, ch. 17, art. IIA, secs. 17-2A.1 through 17-2A.7. California has pioneered in legislation directed at the control of vehicle emissions. As early as in 1947, the state enacted enabling legislation to permit local jurisdictions to cope with specific pollution control problems. National Air Pollution Control Administration Publication No. AP-66 (March 1970), p. 3-1.