EUGENE C. STEWART, Plaintiff-Appellant, *v.* THE VON SOLBRIG HOSPITAL, INC., *et al.,* Defendants-Appellees.

(No. 58850; ▮▮▮▮▮▮▮▮▮▮▮▮)

First District (1st Division)—November 27, 1974.

Reed, Lucas & Doherty, of Chicago (Charles J. Reed, of counsel), for appellant.

William T. Halvorsen, of Chicago, for appellee The Von Solbrig Hospital, Inc.

Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (John R. Caffrey and James T. Ferrini, of counsel), for appellee Central Steel and Wire Company.

Mr. JUSTICE BURKE delivered the opinion of the court:

This is a products liability action brought under the doctrine of strict liability concerning a certain type of surgical pin known as the Rush pin. There were three defendants in this suit: Central Steel and Wire Company (hereinafter "Central"), which produced the stainless steel rod in question; R. Retzl Company, which shaped the rod for its final use; and The Von Solbrig Hospital, Inc. (hereinafter the "Hospital"), which implanted the Rush pin in the plaintiff's left leg. Injuries were allegedly sustained due to a break in this Rush pin while it was still implanted in the plaintiff's leg. The jury awarded the plaintiff a verdict of $40,000 against defendants Central and the Hospital while rendering a verdict for defendant Retzl. The court then entered judgments notwithstanding the verdict for both Central and the Hospital on the defendants' motions. The court refused to grant plaintiff's motion for a judgment notwithstanding the verdict against Retzl. Plaintiff has elected to dismiss his appeal from the judgment in favor of Retzl and only appeals the order which granted Central and the Hospital judgments notwithstanding the verdict.

The Rush pin is a type of intramedullary rod. Intramedullary rods have been utilized by the medical profession to align and stabilize fractures to the tibia bone located in the leg. Dr. Charles R. Von Solbrig, an officer and agent of the defendant hospital corporation, had designed a special type of intramedullary rod which is known as the Rush pin. Retzl was employed to fabricate these Rush pins. In turn, Retzl employed Central to supply a specific type of stainless steel rod which Retzl would form into Rush pins.

In December of 1965 the plaintiff, Stewart, visited Dr. Van Solbrig, an officer of the Hospital corporation, complaining of an injury to his left

leg. Dr. Von Solbrig found that the plaintiff had sustained a severe fracture to his left tibia. On December 28, 1965, an operation was performed by Dr. Von Solbrig in which a Rush pin was inserted into the tibia of the plaintiff's left leg. The rod used to form the pin had been supplied by Central and the pin had been fabricated by Retzl.

Sometime later the pin broke while in the plaintiff's leg. Several operations and complications concerning the plaintiff's left leg transpired after this break. The plaintiff alleges that these subsequent operations and complications were caused by the break in the pin and that a defect in the pin was the cause of the break. A major part of the trial was concerned with the cause of this break.

The plaintiff presented Dr. Lautenschlager, an expert witness in the field of biological materials, who testified concerning defects in the Rush pin. Dr. Lautenschlager testified that he had examined the Rush pin in question and found that it contained certain inclusions (foreign materials found in the metal rod) and scratches upon the metal's surface. These inclusions and scratches were in excess of the amount which is normally found in a Rush pin. He testified that if these inclusions were not present the strength of the pin would have been increased by 50 percent.

The plaintiff's case was tried on the theory that these alleged defects in the Rush pin were what caused the pin to break and were therefore the cause of the plaintiff's injuries. The defense on the other hand was based upon the theory that the break resulted from the plaintiff walking upon his left leg after the cast was removed despite the doctor's orders not to walk on the leg. The defense presented evidence that: (1) the Rush pin was not designed to support a patient's weight when the leg was not in a cast where the fracture had not healed; (2) walking on an unhealed leg without a cast would cause the pin to break; (3) the plaintiff walked on it without a cast when the leg had not healed; (4) the pin broke shortly after the plaintiff started walking on it; and (5) walking upon it was in fact the cause of the break.

A number of witnesses testified concerning the intended function of the Rush pin. Dr. Von Solbrig, called by plaintiff under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 60), said that "the last thing in the world you would want on an intramedullary rod would be to serve as a weight bearing thing." Dr. Greener, another witness for the plaintiff who was an expert in the behavior of engineered materials within the human body, testified on cross-examination that the Rush pin in question was not a weight-bearing rod. Finally, Dr. Thompson, again a witness for the plaintiff, testified that he did not think the function of the Rush pin was to bear weight. There was, however, a great deal of testimony by many of the expert witnesses that the intended function of

the Rush pin was to keep the fracture in alignment and to keep the frac-ture from moving.

There was also testimony concerning what would happen if a patient with a non-defective Rush pin implanted in his leg walked on the leg which had not yet mended without a cast. Dr. Thompson, the plaintiff's expert, agreed on cross-examination that one might reasonably expect that a pin so inserted would break under these conditions. Dr. Greener, another expert witness for the plaintiff, testified that surgical implants in general, if subjected to weight overloads, would normally be expected to fail. Dr. Lautenschlager, another expert for the plaintiff, testified that 2 or 3 days of infrequent walking would have produced the break in the Rush pin that had been inserted in the plaintiff's leg.

After the Rush pin was implanted in the plaintiff's left leg on December 28, 1965, the plaintiff's left leg was continually in a cast until January 31, 1967. X-rays of the plaintiff's leg were taken at periodic intervals during this time span. The X-rays showed only partial healing of the fracture. This partial healing appeared to be reversing itself. Dr. Lautenschlager, one of the plaintiff's experts, testified after examining X-rays taken one week before the removal of the cast that there was no union of the tibia in which the Rush pin was inserted. Dr. Von Solbrig testified that this X-ray showed that there had been no union of the tibia bone which could support weight. Dr. Von Solbrig testified that he therefore instructed the plaintiff not to put any weight on that leg after the cast was removed. Several of the expert witnesses testified that none of the X-rays taken while the leg was in the cast, including the one taken on January 24, 1967, one week before the cast was removed, showed any break in the Rush pin.

The evidence concerning whether the plaintiff walked on his left leg was provided by the plaintiff's own testimony. He testified on direct examination that he did not put any weight on the leg after the cast was removed on January 31, 1967. However, on cross-examination, the plaintiff admitted he walked on the leg for several days. He then qualified this by saying he only walked on it with the aid of crutches. However, the defense attorney pursued him on whether he had in fact walked on the leg:

"Q. You also told Dr. Anderson you walked on it?
A. I had walked on it a couple of days.
Q. You walked on it?
A. All right."

As to the specific cause of the break, Dr. Lautenschlager, plaintiff's witness, testified that 2 or 3 days of infrequent walking upon the Rush pin implanted in the plaintiff's leg would have produced a break in the pin. A metallurgical engineer, Mr. John Sheehan, testified for the defense that

he had examined the rod with an electron microscope. He found that the rod had been subjected to a very high degree of stress over a short period of time. The stress produced the break. When asked his opinion as to what caused this high degree of stress, Mr. Sheehan answered, "Walking."

On February 6, 1967, 1 week after the cast had been removed, and by plaintiff's admission after he had walked on his left leg, another X-ray was taken. This X-ray showed a break in the Rush pin.

Upon this evidence the jury returned a verdict for the plaintiff against defendants Central and the Hospital while finding for defendant Retzl. Defendants Central and the Hospital then moved for a judgment notwithstanding the verdict contending that there was no evidence showing that the alleged defect was the cause of the break. Central and the Hospital contended that the fact that the plaintiff walked on the leg against his doctor's orders was the cause of the break. The court, upon this motion, entered judgments notwithstanding the verdict for the movants Central and the Hospital. The plaintiff appeals from these judgments.

■■ A judgment notwithstanding the verdict should only be entered in cases in which, "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513, 514.) Defendants contend that the plaintiff had completely failed to show that the break in the Rush pin was caused by any defect in the pin but rather was the result of a misuse of the product and therefore they are entitled to the judgments notwithstanding the verdict.

■■ In a products liability case under the doctrine of strict liability a plaintiff "must prove that their injury or damage resulted from a condition of the product, that the condition was an unreasonably dangerous one and that the condition existed at the time it left the manufacturer's control." (*Suvada v. White Motor Co.*, 32 Ill.2d 612, 623, 210 N.E.2d 182, 188.) One element in a plaintiff's case, therefore, must be that the condition which caused his injury is an unreasonably dangerous condition. This "unreasonably dangerous condition" requirement is met when a product is dangerous because it fails to perform its intended function. *Dunham v. Vaughan & Bushnell Mfg. Co.*, 42 Ill.2d 339, 247 N.E.2d 401; *Huckabee v. Bell & Howell, Inc.*, 47 Ill.2d 153, 265 N.E.2d 134.

The uncontradicted testimony in the instant case was that the Rush pin's intended purpose was to align and stabilize the fracture but not to support the body's weight upon an unhealed fracture outside of a cast. The plaintiff in his own reply brief on appeal admits that the Rush pin was not designed for this latter purpose. Furthermore, there was testimony, again uncontradicted, that if a patient walked on an unhealed

fracture containing a Rush pin without a cast on, the pin would reasonably be expected to break.

██ It is clear then that the Rush pin was never intended to support the body's weight but only to align and stabilize the fracture. Therefore, if the pin broke because the plaintiff walked on it without a cast in absence of a union of the bone, then the break had nothing to do with the pin's failure to perform its intended function. A break due to walking on the leg would constitute a misuse of the product against the specific instructions of the plaintiff's doctor. A plaintiff may not recover under strict liability if his injury is the result of his misuse of the product. *Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305.

The plaintiff did present evidence that the Rush pin in question had inclusions and scratches which reduced the pin's strength. However, none of the evidence pointed to the fact that this alleged defect was the cause of the break. Even if the pin had no defects whatsoever, the evidence showed that the pin would have broken if the plaintiff walked on it after his cast was removed. The plaintiff walked on it after his cast was removed by his own admission. The cast had been on for over a year's time and no break manifested itself in the X-rays. However, within one week after the cast was removed, and after the plaintiff had by his own admission walked upon the leg, a break appeared. Finally, an expert testified that a miscroscopic examination of the pin supported the conclusion that the pin broke because it had been subjected to the stress of having been walked upon.

██ We are of the opinion that when all of the evidence is viewed in the light most favorable to the plaintiff, it overwhelmingly supports the defendants' position, so that a verdict for the plaintiff could never stand.

The plaintiff has alleged on appeal that the operations and complications which arose after the Rush pin broke were proximately caused by the break in the pin. It is unnecessary for us to determine this point. We have found that the breaking of the pin was not caused by any defect in the pin, but rather by the misuse of the pin. Therefore, even if the injuries to the plaintiff were caused by the breaking of the pin, the plaintiff still has failed to establish his case. ·

The judgments notwithstanding the verdict entered for the defendants Central and the Hospital are affirmed.

Judgments affirmed.

EGAN, P. J., and HALLETT, J., concur.