JOHN TROSZYNSKI, Plaintiff-Appellee, *v.* COMMONWEALTH EDISON COMPANY, Defendant-Appellant.

First District (3rd Division)   No. 60991

Opinion filed October 7, 1976.

O'Brien, Redding & Hyde, of Chicago (Donald J. O'Brien, Jr., Richard M. O'Brien, Dom J. Rizzi, and Michael W. Rathsack, of counsel), for appellant.

Michael H. Postilion, Ltd., of Chicago, for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, plaintiff, John Troszynski, recovered a verdict from defendant, Commonwealth Edison Company, in the sum of $75,000. The suit, based solely on a theory of products liability, arose when plaintiff, on June 15, 1969, was severely burned upon contacting a live, uninsulated electrical wire contained within defendant's meterbox located in plaintiff's backyard. The trial judge entered judgment on the verdict and defendant appeals, contending that the case should have been decided in its favor as a matter of law.

On September 14, 1968, plaintiff became the resident-owner of a two-story, two-apartment building located in the city of Berwyn. Defendant's meterbox, approximately four feet above the ground, is attached to the rear wall of the building. The meterbox contains two 240-volt single-phase electric meters known as a dual watt-hour meter installation. This assemblage is connected to overhead suspended electrical wires by a metal pipe. The meterbox itself is approximately 12x20 inches with two 4x7 inch glass windows on the front cover. The glass itself is slightly larger than the metal openings and is held in place by four S-shaped spring tension clips inside the box. Thus the meterbox would have to be opened in order to replace the glass. The left window of the meterbox was cracked prior to plaintiff's residency and had not been replaced or repaired at the time of the accident. Plaintiff's wife reportedly had informed defendant of the crack in the glass.

The meter reader who serviced plaintiff's meter prior to the accident testified that unless a glass window was actually broken he would not file a report to defendant to have it replaced. He stated that if the glass were merely cracked, but still in place, he would do nothing about it.

The cover itself is fastened to the body of the box by a wire which is sealed together and imprinted with the year in which it was sealed. Thus the seal must be broken to open the box. The seal on the present meterbox

had the year 1968 inscribed on it. In addition to the name of the manufacturing company, the cover of the meterbox had the following words imprinted on it:

"DO NOT BREAK SEAL
NO FUSES INSIDE
PROPERTY OF ELECTRIC COMPANY"

Inside the meterbox were two electric meters, at the bottom of which were terminals and terminal screws. An insulated terminal cover fit over these screws. Four uninsulated electric cables ran from the underside of each meter into a meter block, which was constructed out of nonconductive metal. Junction terminals and terminal screws located on the meter block connected these four cables from the meter to the meterbox. There existed approximately 1¾-inch clearance between the junction terminals on the meter block and the inside of the box cover, and the junction terminals were about 1 to 1½ inches below each of the window spaces in the box cover.

On June 15, 1969, plaintiff and his two children were in the backyard of the apartment building. Immediately after having hosed the garden beneath the meterbox, plaintiff began throwing a tennis ball with his seven-year-old son. The boy threw the ball over plaintiff's head, striking the already cracked glass window on the meterbox five or six yards away. The glass broke and fell into the meterbox while the ball bounced away. Plaintiff's 16-year-old daughter moved quickly to the meterbox. She removed a ring from her finger and reached out to retrieve the glass from the box. At that instant plaintiff grabbed her arm, testifying that he did not want his daughter to get hurt. He explained that he did not wish her to cut herself. Plaintiff then voluntarily thrust his own left hand through the glassless window and downward into the meterbox. At this time, he was standing in the recently watered garden. As plaintiff slipped his hand down toward the glass, he received a severe electrical shock and was unable to remove his hand. He directed his daughter to enter the basement and turn off the electrical power within the house. When the action had no effect, plaintiff pushed against the wall with his foot for leverage and eventually freed his hand from the meterbox and the electrical current. Plaintiff remained conscious during the entire incident and made certain that no one touched him, fearing that they would "get electrocuted." Plaintiff sustained such severe injuries to his left hand and wrist that he had to undergo nine operations.

Plaintiff's expert witness, Alva Todd, a consulting engineer and president of the Midwest College of Engineering, made a visual examination of the electric meters and meterbox in question without breaking the seal on the cover of the box. Over defendant's objection,

Todd reconstructed the accident. He stated that it appeared plaintiff had contacted the two uninsulated line terminals on the left side within the meterbox. He doubted that standing in damp soil had made any difference. Todd further testified that the accident could easily have been averted through printed warnings, insulation, or a slight modification of the structure of the box itself. He stated that the line terminals could have been insulated by a phenolic barrier costing less than a dime or by rubber. A metallic barrier also could have been installed inside the box immediately below the window opening edge that could have prevented a person from reaching the live terminals inside. Todd explained the difference between plaintiff's "A base meter" and a second type called a "socket meter." The socket meter has no external wiring and plugs into a socket containing the live wires, thus reducing the possibility of injury upon contact. According to Todd, in 1968 the A base meter could have been converted into a socket meter. At the time of the occurrence, of the approximately 2½ million meters in operation owned by defendant, slightly over one million were the A base type. No warning appeared on the meterbox except a tiny "240 volts" which appeared on the meter itself when viewed through the window.

Plaintiff, 55 years of age, had a European high school education and worked as a shipping clerk and loader for a steel company at the time of the occurrence. He had a normal, though obviously unsophisticated, grasp of the concept and dangers of electricity. He was aware of the fact that electricity could burn, shock, or kill, and that it could be transmitted through the human body.

■■ Defendant contends that the trial court should have entered judgment in its favor in this product strict liability action as a matter of law. It specifically asserts that the meterbox was not being used for the purpose for which it was intended or for which it was reasonably foreseeable that it may be used; that plaintiff assumed the risk of injury through his actions; that plaintiff's injury did not result from an unreasonably dangerous or unsafe condition of the meterbox; that the injury was caused by a misuse of the meterbox; that judgment notwithstanding the verdict should have been entered in favor of defendant; and that the verdict was against the manifest weight of the evidence.

In *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, our Supreme Court established the duty of a manufacturer to produce a product reasonably fit for its intended use. (See Restatement (Second) of Torts §402A (1964).) In *Suvada*, the court held that a plaintiff must prove that his injury resulted from a condition of the product, that the condition was an unreasonably dangerous one, and that the condition existed at the time it left the manufacturer's control.

Defendant insists that as a matter of law the meterbox was not in an unreasonably dangerous condition at the time of the accident. *Suvada* made Illinois one of the 12 States which defines products liability in the context of section 402A of the Restatement (Second) of Torts. (See *Clary v. Fifth Avenue Chrysler Center, Inc.* (Alaska 1969), 454 P.2d 244.) Thus comment i to section 402A is instructive in defining "unreasonably dangerous" in Illinois:

> "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics."

(*City of Chicago v. General Motors Corp.* (7th Cir. 1972), 467 F.2d 1262; see also *Pyatt v. Engel Equipment, Inc.* (1974), 17 Ill. App. 3d 1070, 309 N.E.2d 225.) It has been noted that Illinois cases "* * * have emphasized that it is the unexpected performance of the product which is the gist of the action." (*Becker v. Aquaslide 'N' Dive Corp.* (1975), 35 Ill. App. 3d 479, 490, 341 N.E.2d 369.) The court in *Dunham v. Vaughan & Bushnell Mfg. Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401, provides at page 342 that products "* * * are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function."

Because of this understandable lack of specificity in spelling out what constitutes an "unreasonably dangerous condition", it naturally falls upon a jury in most instances to make this determination as a matter of fact. (See *Rivera v. Rockford Machine & Tool Co.* (1971), 1 Ill. App. 3d 641, 274 N.E.2d 828; *Mahoney v. Roper-Wright Manufacturing Co.*, (7th Cir. 1973), 490 F.2d 229.) In the present case, we believe that the jury was presented with sufficient evidence to justify the conclusion that the meterbox was in an unreasonably dangerous condition at the time of plaintiff's injury.

The meterbox contained exposed, uninsulated electrical wires. No warning appeared on the box reciting that these live wires were within the box. Once the glass was removed from the cover of the meterbox, nothing stood between the window and the admittedly dangerous wires. Testimony revealed that insulation or a simple metal plate would have prevented contact with the wiring and exposure to electrical shock. The glass on the window had been cracked prior to plaintiff's moving in to the premises and had not been replaced. In 1968 there was no known way to provide a glass window that would not crack or fall inside the box so as to give absolute protection from the uninsulated wires. Defendants had in use at the time meter installations of the socket type which contained no exposed uninsulated wiring. The jury also realized that a meterbox is a common item found attached to numerous homes and often within easy

reach of a passerby. Considering the evidence, the determination that the meterbox was in an unreasonably dangerous condition at the time of plaintiff's mishap was well within the province of the jury.

Defendant's second contention is closely related to the aforementioned condition of the meterbox. It maintains that plaintiff's injury as a matter of law was not the result of an intended use of the meterbox or of a use which was reasonably foreseeable to expect. Therefore defendant argues that plaintiff does not fall within the ambit of protection as outlined in *Suvada*. This argument is based primarily on the decision of our Supreme Court in *Winnett v. Winnett* (1974), 57 Ill. 2d 7, 310 N.E.2d 1, in which a four-year-old girl was injured when she placed her hand on a moving conveyor belt or screen on a forage wagon then being operated on her grandfather's farm. The court held that it was not foreseeable that a young child would be permitted to approach the equipment while in operation or to place her fingers in or on the holes in its moving screen. The child was deemed to be neither a user nor a consumer of the product as viewed in traditional product liability terms. However, the court refused to classify the child as a "bystander," totally rejecting that type of classification of persons for whose injuries courts have allowed recoveries in favor of the following tests based on foreseeability:

> "We, however, find this categorization of plaintiffs as users, consumers or innocent bystanders helpful only in a general sense. In the unusual case the application of these labels does not assist resolution of the issues. In our judgment the liability of a manufacturer properly encompasses only those individuals to whom injury from a defective product may reasonably be foreseen and only those situations where the product is being used for the purpose for which it was intended or for which it is reasonably foreseeable that it may be used. Any other approach to the problem results in making the manufacturer and those in the chain of product distribution virtual insurers of the product, a position rejected by this court in *Suvada*. " (57 Ill. 2d 7, 11.)

The court at pages 12-13 then defined foreseeability in the context as meaning "* * * that which it is objectively reasonable to expect, not merely what might conceivably occur."

We agree with defendant that the intended use of a meterbox is for its employees to determine the amount of electricity which has been used by the occupant of the residence on which the meter has been attached. Plaintiff obviously did not come into contact with the meter installation for that reason. Thus under *Winnett* this court must determine if the jury was presented sufficient evidence to conclude that plaintiff sustained his injury while using the product in a manner which was reasonable to foresee.

The evidence revealed that a middle-aged man of average intelligence and experience thrust his hand into a meterbox to retrieve a piece of glass accidentally broken by his son while throwing a tennis ball. The entire apparatus was constructed so that once the glass was gone a dangerous uninsulated electrical wire lay exposed inches from the window. The cover contained no warning that this dangerous situation existed within the box. The reader merely was admonished not to break the seal as no fuses were contained within. The box itself was held shut only by a wire hasp which could be opened by anyone in possession of a pair of wire cutters.

The apparatus is a common item. More than one million such boxes were in use by defendant at the time of the accident. The potential contact with the public was enormous. Because of the abundance of the equipment and the easy accessibility to the boxes it is not unreasonable to have expected defendant to fully insulate them. It is foreseeable that a member of the public would be injured if dangerous, uninsulated wires were left in an accessible position without adequate warning. The jury, therefore, easily could have concluded that it was objectively reasonable for defendant to have foreseen that a person would come into contact with the exposed wires contained within the box. We note also that the issue of foreseeability was before the jury in four instructions given by the court.

The present case is clearly distinguishable from the decision in *Winnett*. That case turned on the fact that an unsupervised child would be permitted to approach dangerous farm equipment in operation. Here the product is a common item which rests a few feet off the ground in a typical backyard frequented by all members of a family. Our holding is in accord with that of *Stanfield v. Medalist Industries, Inc.* (1975), 34 Ill. App. 3d 635, 340 N.E.2d 276, wherein the operator of a boring and cutting machine was injured. In upholding the judgment for the plaintiff, this court stated page 640:

"We find that *Winnett* is clearly distinguishable from the case at bar. Simply stated, injury to a 4-year-old child by a farm forage wagon is clearly different than injury to an inexperienced and/or unsupervised adult operator of a boring and cutting machine. We cannot say as a matter of law that injury to the plaintiff in this case was not objectively reasonable to expect. The statement of the court in the appellate court opinion in *Dunham*, is of interest in this context:

' * * * the question of what consititutes an ordinary use is clearly a question of fact and that the foreseeability of careless use is a matter for a jury, unless the use of the product was, in fact, so unintended and unforeseeable that

the case should be taken from the jury' (86 Ill. App. 2d 315, 330, 229 N.E.2d 684, 691.)

We therefore find that the issue of whether the product in question was unreasonably dangerous and whether the injury to the plaintiff was foreseeable present questions to be resolved by a jury."

■■ Citing its own opinion in *Dunham,* the court in *Winnett* acknowledges that questions of foreseeability are ordinarily a question for the jury to decide. In light of the circumstances of the present case, the decision of the triers of fact should be upheld.

■■ Defendant next contends that plaintiff is barred from recovery as a matter of law because he had assumed the risk of injury. Although contributory negligence is not a valid defense to a product liability case in Illinois, defendant can assert assumption of risk as an affirmative defense. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305; see *Kinka v. Harley-Davidson Motor Co.* (1976), 36 Ill. App. 3d 752, 344 N.E.2d 655.) In *Williams* the court, at page 430, outlined the subjective test to be used concerning assumption of risk:

"Furthermore, while the test to be applied in determining whether a user has assumed the risk of using a product known to be dangerously defective is fundamentally a subjective test, in the sense that it is *his* knowledge, understanding and appreciation of the danger which must be assessed, rather than that of the reasonable prudent person (Restatement (Second) of Torts, §496D, comment (c)), it must also be remembered that this is ordinarily a question to be determined by the jury."

The court adds that the age, experience, knowledge and understanding of the plaintiff as well as his own testimony is to be weighed by the jurors in their decision.

The danger of electrical energy is a matter of common knowledge to all persons of ordinary intelligence and experience. (*Genaust v. Illinois Power Co.* (1976), 62 Ill. 2d 456, 343 N.E.2d 465.) However, the present case does not involve a person who deliberately approached an electrical apparatus which the average person would consider an obvious danger. No warning existed on the box, and a person of plaintiff's intelligence and experience might well have expected such a common, easily accessible item which defendant placed within his backyard to have been properly insulated or designed. We do not find this to have been an unreasonable expectation on plaintiff's part; as such, the final determination of the subjective question is a matter for the jury. (*Pioneer Hi-Bred Corn Co. v. Northern Illinois Gas Co.* (1973), 16 Ill. App. 3d 638, 306 N.E.2d 337; *Williams v. Brown Manufacturing Co.* ) Neither in his testimony nor by his actions did plaintiff reveal a knowledge of the danger or of the

existence of any exposed wires. Indeed, his lack of experience in the field was demonstrated by the futile direction given his daughter to turn off the electricity in the basement to release him.

Two cases cited by defendant in support of its contention that assumption of risk should have been decided in this case as a matter of law are factually distinguishable from the present case. In *Moran v. Raymond Corp.* (7th Cir. 1973), 484 F.2d 1008, the testimony revealed that plaintiff had full knowledge of the danger but proceeded regardless. In *Fore v. Vermeer Manufacturing Co.* (1972), 7 Ill. App. 3d 346, 287 N.E.2d 526, injury was sustained by an experienced operator of a trenching maching who was familiar with the danger inherent in his course of conduct but who proceeded anyway. In our case, plaintiff never knew the uninsulated exposed wires were within his reach in the meterbox, and no evidence indicated that plaintiff truly appreciated the risk. At trial, during the instructions conference, plaintiff's counsel objected to an assumption of risk instruction being given to the jury. In urging successfully that such an instruction be given, defense counsel stated as follows:

> "It is my contention that it is a jury's function as to the assumption 'did he know that which he assumed to do when he put his hand in there.'
>
> I think it is strictly a jury question, and this instruction as tendered, says that the plaintiff was aware, that I have to prove that he was aware of a condition of the product which rendered the product not reasonably safe, taking into consideration the plaintiff's age, knowledge and understanding.
>
> I am letting a jury decide."

In view of all the circumstances, the issue was a matter for the jury.

Defendant next contends that plaintiff cannot recover because his injury resulted from a misuse of the meterbox. In Illinois misuse of a product occurs when it is used for a purpose neither intended nor foreseeable. (*Walker v. Trico Manufacturing Co.* (1973), 487 F.2d 595; *Williams v. Brown Manufacturing Co.*; see also *Stewart v. Von Solbrig Hospital, Inc.* (1974), 24 Ill. App. 3d 599, 321 N.E.2d 428.) We can only repeat that it was the duty of the triers of facts to decide whether plaintiff's use of the meterbox was foreseeable. Sufficient evidence was presented to support their determination. *Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, 311 N.E.2d 128.

■■ Defendant also contends that this court should grant a judgment notwithstanding the verdict in its favor. To allow this, the evidence presented, when viewed in the light most favorable to plaintiff, must so overwhelmingly favor defendant that no contrary verdict could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d

504; *Weiss v. Rockwell Manufacturing Co.* (1973), 9 Ill. App. 3d 906, 293 N.E.2d 375.) Having viewed the evidence, we believe that such a determination cannot be made. For the same reasons, we cannot say that the verdict was against the manifest weight of the evidence.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

DEMPSEY and McGLOON, JJ., concur.